# In the United States District Court
## for the Southern District of Georgia
### Waycross Division

JIMMY PAULK; TARA WILCOX; and
ESTES PARK, L.P.,

  Plaintiffs,

  v.

GEORGIA DEPARTMENT OF
TRANSPORTATION; RUSSELL R.
MCMURRAY, in his official
capacity as the Commissioner
of the Georgia Department of
Transportation; and the STATE
OF GEORGIA,

  Defendants.

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

CV 516-19

## ORDER

  This matter comes before the Court on a Motion to Dismiss
(dkt. no. 8) and Motion to Stay Discovery (dkt. no. 9) filed by
Defendants Georgia Department of Transportation (the "GDOT"),
Commissioner of the GDOT Russell R. McMurray ("Commissioner
McMurray"), and the State of Georgia (the "State")
(collectively, "Defendants").[1] Also pending in this action is a
Motion for Preliminary Injunction (dkt. no. 14) filed by

---

[1]  In accordance with the Complaint filed in this action, the docket
lists "Russell R. Murray, in his official capacity as the Commissioner
of the Georgia Department of Transportation," as a Defendant.
However, Defendants' briefing shows that the correct name of this
individual is "Russell R. McMurray." See, e.g., Dkt. No. 8-1, p. 1.
The Clerk of Court is thus **DIRECTED** to update the docket to reflect
the proper name of this party.

Plaintiffs Jimmy Paulk ("Paulk"); Tara Wilcox ("Wilcox"); and Estes Park, L.P. ("Estes Park") (collectively, "Plaintiffs"). For the reasons that follow, Defendants' Motion to Dismiss (dkt. no. 8) is **GRANTED**. Accordingly, the Court has no cause to grant any stay or injunction.

## BACKGROUND

Paulk, an African American disabled veteran, and Wilcox, an African American mother of two, live in Estes Park Apartments. Dkt. No. 6 ("Pl.'s Am. Compl."), ¶¶ 7-9. Estes Park Apartments is an affordable housing complex that is owned and operated by Estes Park. Id. at ¶ 9. The complex was built in 2003 and financed with federal funding, including Low Income Housing Tax Credits issued and monitored by the Georgia Department of Community Affairs (the "DCA"). Id. Estes Park also receives United States Department of Agriculture ("USDA") Loan Guarantees and Interest Credits for the complex, and ten of its tenants use Section 8 vouchers issued by the United States Department of Housing and Urban Development ("HUD") to pay their rent. Id. All of the tenants in Estes Park Apartments have incomes falling below sixty percent of the median income in the community, with most having incomes below the national poverty level, and approximately sixty percent of the tenants are minority. Id. at ¶ 10.

AO 72A
(Rev. 8/82)

The State receives federal financial assistance for certain of its operations. _Id._ at ¶ 14. The GDOT, a state governmental agency, "plans, constructs, maintains, and improves the State['s] roads and bridges." _Id._ at ¶ 12. Commissioner McMurray is responsible for managing and overseeing the GDOT. _Id._ at ¶ 13.

## I. Road Improvement Project

Sometime prior to May 30, 2007, the GDOT proposed a Road Improvement Project (the "Project") to ameliorate current and future traffic congestion along State Route 135/Perimeter Road ("SR 135" or the "roadway"). _Id._ at ¶¶ 15, 32. SR 135 currently is a two- and three-lane, heavily trafficked roadway. _Id._ at ¶ 16. Estes Park Apartments is located on the east side of a two-lane portion of SR 135, _id._ at ¶ 17, and on the opposite side are five nonminority-owned business properties and no residential development, _id._ at ¶ 27.

The GDOT's proposed Project included widening and reconstructing nearly three miles of SR 135. _Id._ at ¶¶ 18-19. As part of this endeavor, the GDOT planned to reroute the northbound and southbound lanes of the roadway onto the Estes Park Apartments property, which, according to Plaintiffs, would involve "taking approximately 110 feet by 410 feet of the front of the property and result[] in a heavily trafficked roadway running within seven feet of the clubhouse and [thirty] feet

from a building containing residential units." Id. at ¶ 20. Plaintiffs assert that the proposed Project contemplated rerouting only the portion of roadway adjacent to Estes Park Apartments and allowed the remainder of the roadway to be widened on its existing alignment. Id. at ¶ 22.

According to Plaintiffs, construction of the rerouted roadway in accordance with the proposed Project will result in the following:

- there will be increased traffic along the roadway;

- the Estes Park Apartments clubhouse and laundry room "will become unusable due to their proximity to the new roadway;"

- children using the complex's playground will face increased danger from the nearby roadway;

- "[a]t least eight tenants may be displaced, including six minority tenants;"

- "[n]oise levels will rise to 70 db"—a level prohibited by applicable regulations—and thus "will result in a risk of loss of federal subsidies and correspondingly will result in tenants being forced to relocate;"

- green space, noise-reducing structures, metal fencing, landscaping, a mail station, and a parking area will be destroyed without the possibility of relocation or replacement;

- access to the complex will become more limited; and

- tenants and their children using the common areas will face
  a substantial risk to their safety.

Id. at ¶¶ 19, 23.  Plaintiffs contend that under the proposed

Project, "African American tenants including both Mr. Paulk and

Ms. Wilcox will be forced to vacate Estes Park [Apartments],"

while the businesses on the opposite side of SR 135 will suffer

no adverse impact.  Id. at ¶¶ 26-27.

The GDOT held an Initial Team Concept Meeting for the

proposed Project on May 30, 2007.  Id. at ¶ 32.  Present at that

meeting were four city officials, including the City Manager and

the Director of Community Development, both of whom were

familiar with Estes Park Apartments and its population of

minority tenants.  Id.  The City Manager warned GDOT

representatives at the meeting that "the new apartments at the

northeast quadrant of the railroad . . . would be upset with the

impacts to their property because they tried hard to coordinate

with the City and State to accommodate the different

alternatives at that time."  Id. at ¶ 33.  As a result,

Plaintiffs contend, the GDOT was aware at least as early as the

Initial Team Concept Meeting that Estes Park Apartments had a

significant number of minority tenants that would be adversely

affected by the proposed Project.  Id. at ¶ 32.

AO 72A
(Rev. 8/82)

To fund the proposed Project, the GDOT sought to obtain federal financial assistance through the United States Federal Highway Administration ("FHWA") of the United States Department of Transportation. Id. at ¶ 28. FHWA regulations required that the GDOT complete a National Environmental Policy Act ("NEPA") report and find that the proposed Project have no significant negative impact. Id. at ¶ 29. As part of the NEPA report, the GDOT was required to conduct and provide the results of an Environmental Justice Overview Analysis (the "EJ") evaluating "disproportionate and adverse impacts of the proposed Project on minority and low-income populations." Id. at ¶ 31. According to Plaintiffs, the FHWA instructs recipients of financial assistance "to use current census data and the input of local organizations . . . in determining the impact of a proposed project on minority communities." Id. If the EJ reflects that the project will have a disproportionately high adverse effect on a minority population, the NEPA report must evaluate the availability of a mitigation measure or practicable alternative that would eliminate or reduce that effect. Id.

According to Plaintiffs, the GDOT "intentionally used misleading data to conclude there was no EJ impact from the proposed Project." Id. at ¶ 35. Specifically, Plaintiffs contend that the GDOT used data from the 2000 census, which was compiled before the 2003 construction of Estes Park Apartments,

AO 72A
(Rev. 8/82)

instead of using the 2010 census data that would have included the minority tenants in the complex. Id. Plaintiffs also assert that the GDOT "never contacted Estes Park's owner or the tenants or any other organization in the community to discuss the impact on Estes Park [Apartments]." Id. at ¶ 36. Plaintiffs aver that the GDOT did not mention Estes Park Apartments or its tenants in the EJ or the NEPA report and, instead, represented that the communities with minority populations in the area "were not located in close proximity to the proposed [P]roject area and would at the very most[] be anticipated to experience indirect effects associated with the [P]roject." Id. at ¶ 37. According to Plaintiffs, the GDOT not only eliminated any consideration of the minority tenants in Estes Park Apartments from its study but also made false and misleading statements concerning the lack of impact on the tenants "to accomplish its goal of lessening the impact of the Project on non-minority owned business while imposing a significantly adverse burden on minority tenants who will be evicted from their homes if the proposed roadway is constructed." Id. at ¶¶ 35, 38.

## II. Eminent Domain Proceeding in State Court

On July 17, 2015, the GDOT initiated an eminent domain proceeding in the Superior Court of Coffee County, seeking, in part, to take the portion of Estes Park Apartments property

needed to move forward with the Project. See id. at ¶ 24; Dkt. No. 8, Ex. A (GDOT condemnation petition). On August 21, 2015, Estes Park filed a petition to set aside the taking on several grounds, including that the GDOT did not comply with federal law in conducting the EJ, and that the Project is discriminatory in violation of the Fair Housing Act. See Pl.'s Am. Compl., ¶ 25; Dkt. No. 8, Ex. B (Estes Park's petition to set aside), §§ 6-7. On December 10, 2015, while the eminent domain proceeding remained pending, Estes Park representatives met with GDOT officials and introduced an alternative plan that involved taking only twenty feet of Estes Park Apartments property and purportedly would result in less of an adverse impact on its tenants, no harm to the property of others, and less cost to the GDOT. Pl.'s Am. Compl., ¶ 39. Plaintiffs maintain, however, that the GDOT refused to consider the alternative plan and proceeded with the eminent domain action. Id.

## III. Plaintiffs' Filing of This Action

On February 19, 2016, before the Superior Court of Coffee County entered any order in the eminent domain proceeding, Plaintiffs filed a Complaint against Defendants in this Court. Dkt. No. 1. Plaintiffs have since submitted an Amended Complaint, in which they expressly recognize the pendency of the state-court proceeding and acknowledge that "[t]here has been no judgment issued in that matter." Pl.'s Am. Compl., ¶ 25.

AO 72A
(Rev. 8/82)

Nevertheless, Plaintiffs bring several claims against Defendants relating to the Project, pursuant to the following: the Fair Housing Act, 42 U.S.C. §§ 3601–19 (the "FHA") (count one); Title VI of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000d to 2000d-7 ("Title VI") (count two); 42 U.S.C. § 1983 ("Section 1983") (count three); the Community Development Block Grants ("CDBG") requirements (count four); and the Declaratory Judgment Act, 28 U.S.C. §§ 2201-02 (count five). Id. at ¶¶ 40-63.

As relief, Plaintiffs seek a declaration that Defendants have discriminated against them on the basis of race, familial status, and "handicap," in violation of the FHA, Title VI, and Section 1983, and an injunction against any further discriminatory conduct. Id. at pp. 17-18. Significantly, Plaintiffs also ask the Court to "[e]njoin the Defendants from carrying out the proposed Project including, but not limited to, seeking to take a portion of Estes Park['s] . . . property through eminent domain." Id. at p. 18. Plaintiffs request an award of damages for injuries allegedly suffered as a result of Defendants' discriminatory conduct, as well as attorney's fees. Id.

On April 4, 2016, Defendants timely filed the instant Motion to Dismiss Plaintiffs' Amended Complaint, dkt. no. 8, and simultaneously moved to stay discovery in this case pending a ruling on that Motion, dkt. no. 9. Along with their Motion,

Defendants have included copies of the relevant filings in the Superior Court of Coffee County, including an order and entry of final judgment showing that the state court denied Estes Park's petition to set aside the GDOT's taking on March 29, 2016. Dkt. No. 8, Exs. E-F. On May 10, 2016, Plaintiffs filed the instant Motion for Preliminary Injunction representing that Defendants had begun destruction efforts on the property and seeking to halt further efforts to construct the roadway. Dkt. No. 14. In a Telephonic Status Conference on May 13, 2016, the Court set an expedited briefing schedule for these Motions and directed that the parties maintain the status quo on the subject property until such time as the parties had briefed the issues and the Court was in a position to rule on Plaintiffs' Motion. Dkt. Nos. 16, 18-19. The parties have since submitted their briefs, see dkt. nos. 12, 20-21, 23, and the Motions are ripe for review.

## DISCUSSION

### I. Defendants' Motion to Dismiss (Dkt. No. 8)

In support of their Motion, Defendants initially argue that the Court should abstain from exercising jurisdiction over this matter pursuant to Younger v. Harris, 401 U.S. 37, 37 (1971).

Dkt. No. 8-1, pp. 5-8.[2] Defendants also contend that, even if the Court were to hear this case, the Eleventh Amendment bars Plaintiffs' FHA and Section 1983 claims against the State and the GDOT and, to the extent that these claims seek damages and past equitable relief, against Commissioner McMurray. Id. at pp. 8-11. Finally, Defendants maintain that Plaintiffs' Amended Complaint fails to set forth a plausible claim for relief under any of the asserted counts. Id. at pp. 11-25.

Plaintiffs respond, in part, that Younger abstention does not apply to FHA and similar claims and thus has no bearing on the Court's ability to decide this case. Dkt. No. 12, pp. 3-5. Plaintiffs concede that they may not bring FHA or Section 1983 claims against the State or the GDOT, and that they may not seek damages from Commissioner McMurray under the FHA or Section 1983. Id. at p. 6 n.1. They assert, however, that the Eleventh Amendment poses no bar insofar as their FHA and Section 1983 claims seek declaratory and injunctive relief, as well as attorney's fees and costs, from Commissioner McMurray. Id. at pp. 6-7. Plaintiffs also argue that their FHA, Title VI, Section 1983, and declaratory-judgment claims are legally sufficient to withstand dismissal. Id. at pp. 8-23.

---

[2] Defendants also cite the abstention doctrine under Burford v. Sun Oil Co., 319 U.S. 315, 315 (1943), as a possible basis for dismissal. Dkt. No. 8-1, p. 5 n.3.

AO 72A
(Rev. 8/82)

## A. Standard of Review

Federal Rule of Civil Procedure 8(a) requires that a plaintiff's complaint contain both "a short and plain statement of the grounds for the court's jurisdiction" and "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(1)-(2). A responding party thus may move to dismiss the complaint based on a "lack of subject-matter jurisdiction," Fed. R. Civ. P. 12(b)(1), or a "failure to state a claim upon which relief can be granted," Fed. R. Civ. P. 12(b)(6) ("Rule 12(b)(6)"). In addition, a district court must dismiss an action if it finds at any time that it lacks subject-matter jurisdiction. Fed. R. Civ. P. 12(h)(3).

A Rule 12(b)(6) motion challenges the legal sufficiency of the complaint in setting forth a claim to relief. See Fed. R. Civ. P. 12(b)(6). While a complaint need not contain detailed factual allegations, it "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (citing Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)) (interpreting Fed. R. Civ. P. 8(a)(2)). To be plausible on its face, a complaint must set forth enough facts to "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id.

A plaintiff, therefore, must plead more than mere labels and conclusions, and a formulaic recitation of the elements of a particular cause of action does not suffice. Twombly, 550 U.S. at 555. Rather, at a minimum, a complaint should "contain either direct or inferential allegations respecting all the material elements necessary to sustain a recovery under some viable legal theory." Fin. Sec. Assurance, Inc. v. Stephens, Inc., 500 F.3d 1276, 1282-83 (11th Cir. 2007) (per curiam) (quoting Roe v. Aware Woman Ctr. for Choice, Inc., 253 F.3d 678, 683 (11th Cir. 2001)).

In evaluating a Rule 12(b)(6) motion, a court must "accept as true the facts as set forth in the complaint and draw all reasonable inferences in the plaintiff's favor." Randall v. Scott, 610 F.3d 701, 705 (11th Cir. 2010). Ordinarily, a court's review on a motion to dismiss is limited to the factual allegations on the face of the complaint, see Iqbal, 556 U.S. at 678, and a party's presentation of matters outside of the pleadings transforms the motion into one for summary judgment, Fed. R. Civ. P. 12(d). However, there are certain instances in which a court may consider matters outside of the pleadings at the dismissal stage, see Davis v. Self, 547 F. App'x 927, 929 (11th Cir. 2013), including, for example, facts that are subject to judicial notice, see Fed. R. Evid. 201(a)-(d); Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322 (2007); see

also Boateng v. InterAmerican Univ., Inc., 210 F.3d 56, 60 (1st Cir. 2000) (documents from state-court adjudications are public records subject to judicial notice).

## B. **Younger** Abstention

In Younger, the United States Supreme Court recognized that while a federal court has a "'virtually unflagging obligation' to exercise jurisdiction" over a case pending before it, a limited exception exists where "'extraordinary circumstances' counsel abstention in favor of pending state proceedings." Seminole Tribe of Fla. v. Stranburg, 799 F.3d 1324, 1344 n.15 (11th Cir. 2015) (quoting For Your Eyes Alone, Inc. v. City of Columbus, 281 F.3d 1209, 1215-16 (11th Cir. 2002)); see also Dandar v. Church of Scientology Flag Serv. Org., 619 F. App'x 945, 947 (11th Cir. 2015) (noting that nonabstention is the general rule, and abstention is "an extraordinary and narrow exception" thereto (first citing 31 Foster Children v. Bush, 329 F.3d 1255, 1274 (11th Cir. 2003); then quoting Green v. Jefferson Cty. Comm'n, 563 F.3d 1243, 1251 (11th Cir.2009))). The extraordinary circumstances in which abstention is appropriate "are limited to situations in which there is: (1) a parallel and pending state criminal proceeding; (2) a state civil enforcement proceeding; or (3) a state civil proceeding involving an order that is 'uniquely in furtherance of the state courts' ability to perform their judicial functions.'" Dandar,

AO 72A
(Rev. 8/82)

619 F. App'x at 947 (quoting Sprint Commc'ns, Inc. v. Jacobs, 134 S. Ct. 584, 588, 591 (2013)).

If a court finds that a case presents one of these exceptional circumstances, only then does it consider whether "additional factors" weigh in favor of abstention. Id. at 947-98 (quoting Sprint Commc'ns, Inc., 134 S. Ct. at 593). Those factors include the following: (1) whether the state proceeding is an ongoing judicial proceeding; (2) whether the proceeding implicates important state interests; and (3) whether there is an adequate opportunity to raise a constitutional challenge in that proceeding. 31 Foster Children, 329 F.3d at 1274 (quoting Middlesex Cty. Ethics Comm. v. Garden St. Bar Ass'n, 457 U.S. 432 (1982)). Where all three of the Middlesex factors are met, a court must abstain from hearing the case in order to avoid interfering with the ongoing state-court proceedings. See id. However, even where all three of the Middlesex factors favor abstention, abstention is not appropriate if "(1) there is evidence that the state proceedings are motivated by bad faith; (2) irreparable injury would occur; or (3) there is no adequate alternative state forum where constitutional issues can be raised." Dandar, 619 F. App'x at 948 (quoting Hughes v. Att'y Gen. of Fla., 377 F.3d 1258, 1263 n.6 (11th Cir. 2004)).

Abstention is undeniably the appropriate course here. This case falls under the third category of "extraordinary

AO 72A
(Rev. 8/82)

circumstances" that trigger the Younger abstention, because the eminent domain proceeding in the Superior Court of Coffee County involved an order uniquely furthering the court's ability to perform its judicial functions. See Sprint Commc'ns, Inc., 134 S. Ct. at 591 (citing New Orleans Pub. Serv., Inc. v. Council of City of New Orleans, 491 U.S. 350, 368 (1989); Juidice v. Vail, 430 U.S. 327, 336 n.12 (1977); and Pennzoil Co. v. Texaco Inc., 481 U.S. 1, 13 (1987)). As the Supreme Court has explained, "States have important interests in administering certain aspects of their judicial systems." Pennzoil Co., 481 U.S. at 12-13. While perhaps the State's interest in the exercise of judicial power in such cases "is not quite as important as is the State's interest in the enforcement of its criminal laws, . . . or even its interest in the maintenance of a quasi-criminal proceeding . . . . [,] it is of sufficiently great import to require application of the [abstention] principles of those cases." Id. (quoting Juidice, 430 U.S. at 335); see also Watson v. Fla. Judicial Qualifications Comm'n, 618 F. App'x 487, 489 (11th Cir. 2015) ("Younger abstention is applicable to noncriminal judicial proceedings that vindicate important state interests or are necessary for the state's judicial system to function." (citing 31 Foster Children, 329 F.3d at 1274).

Relevant here is that courts have long recognized that a state has an important interest in having its own courts apply

AO 72A
(Rev. 8/82)

its eminent domain law.  See, e.g., Rumber v. Dist. of Columbia, 598 F. Supp. 2d 97, 111 (D.D.C. 2009) (eminent domain proceedings are an "important state interest" warranting abstention under Younger); Crown Point I, LLC v. Intermountain Rural Elec. Ass'n, 319 F.3d 1211, 1215 (10th Cir. 2003) (same); Duty Free Shop, Inc. v. Administracion De Terrenos De Puerto Rico, 889 F.2d 1181, 1182 (1st Cir. 1989) (same); see also La. Power & Light Co. v. City of Thibodaux, 360 U.S. 25, 26 (1959) ("The fundamental fact is that eminent domain is a prerogative of the state." (quoting Madisonville Traction Co. v. St. Bernard Mining Co., 196 U.S. 239, 257 (1905))).  Indeed, the State of Georgia, by statute, specifically entrusts to its superior courts the responsibility to oversee and resolve any issues relating to the exercise of eminent domain.  See O.C.G.A. § 22-2-65 ("Within ten days after the award [of just compensation] is made, it shall be filed and recorded in the office of the clerk of the superior court of the county where the property or interest is situated."); id. § 22-2-80 ("In case either party is dissatisfied with the amount of the assessors' award, he or they may . . . enter in writing an appeal from the award to the superior court of the county where the award is filed.  . . . [I]t shall be the duty of the judge to cause an issue to be made and tried by a jury as to the value of the property or interest taken or the amount of damage done."); id. § 32-3-4(a)

("Whenever any state agency . . . desires to take or damage private property . . . for public road purposes . . . [and] shall for any reason conclude that it is desirable to have a judicial ascertainment of any question connected with the matter, such state agency . . . may file a proceeding in rem in the superior court of the county having jurisdiction condemning the property or interests to the use of the petitioner."). The GDOT's action in the Superior Court of Coffee County thus implicated an important State interest in having a Georgia superior court resolve condemnation issues and involved an order in furtherance of the court's ability to perform that specialized role.[3]

Additionally, the <u>Middlesex</u> factors dictate that the Court should abstain from exercising jurisdiction over this case. It is undisputed that the eminent domain proceeding was pending at the time that Plaintiffs filed this action, Pl.'s am. compl., ¶ 25, and thus was an ongoing judicial proceeding in satisfaction of the first factor, <u>see</u> <u>31 Foster Children</u>, 329 F.3d at 1274 (quoting <u>Middlesex Cty. Ethics Comm.</u>, 457 U.S. at 432). The proceeding satisfied the second factor, because, as discussed above, it implicated an important State interest in having the state court apply state eminent domain law. <u>See</u> <u>31 Foster</u>

---

[3]  The record shows that during the pendency of the instant case, the Superior Court of Coffee County did, in fact, enter a lengthy order resolving the condemnation issues raised in the GDOT's and Estes Park's petitions. <u>See</u> Dkt. No. 8, Ex. E.

AO 72A
(Rev. 8/82)

Children, 329 F.3d at 1274 (quoting Middlesex Cty. Ethics Comm., 457 U.S. at 432). Finally, under the third factor, Plaintiffs have not shown that they were denied, in any way, the opportunity to raise their federal claims in the eminent domain proceeding. Id. at 1274, 1279 (plaintiffs bear the burden of rebutting the presumption that the state procedures afford an adequate remedy for federal claims). The record reflects that Estes Park did, in fact, assert FHA claims in the state-court proceeding, see dkt. no. 8, ex. B, § 7, and nothing suggests that Plaintiffs were procedurally prevented from raising their Title VI and Section 1983 challenges at that time.

As there is no allegation of bad faith or other special circumstance that would justify exercising jurisdiction, see Dandar, 619 F. App'x at 948 (quoting Hughes, 377 F.3d at 1263 n.6), the Court must abstain from hearing Plaintiffs' claims so as not to interfere with the Superior Court of Coffee County's authority to decide the eminent domain action. Defendants' Motion to Dismiss based on the Younger abstention is, therefore, **GRANTED**.[4] However, in an abundance of caution, the Court notes

---

[4]  Defendants' alternative argument based on the Burford abstention doctrine lacks merit. See Dkt. No. 8-1, p. 5 n.3. Under Burford, a federal court may dismiss certain actions "in deference to complex state administrative procedures." King v. Cessna Aircraft Co., 505 F.3d 1160, 1167 (11th Cir. 2007) (citing Quackenbush v. Allstate Ins. Co., 517 U.S. 706, 709 (1996), and Burford, 319 U.S. at 333 n. 29). Here, the eminent domain proceeding was judicial rather than administrative in nature and thus was not within the scope of the Burford abstention.

that even if abstention did not demand dismissal, the Defendants' alternative arguments for dismissal would have prevailed, as explained below.

## C. Eleventh Amendment Immunity

States are immune from private suits pursuant to the Eleventh Amendment and traditional principles of state sovereignty. Alden v. Maine, 527 U.S. 706, 712-13 (1999). Because a lawsuit against a state agency or a state officer in his official capacity is "no different from a suit against the [s]tate itself," these defendants are immune from suit. Will v. Mich. Dep't of State Police, 491 U.S. 58, 71 (1989). Notably, however, the Eleventh Amendment bars "[r]elief that in essence serves to compensate a party injured in the past by an action of a state official in his official capacity that was illegal under federal law" and does not bar a suit against a state officer in his official capacity for "relief that serves directly to bring an end to a present violation of federal law." Papasan v. Allain, 478 U.S. 265, 278 (1986).

In the instant matter, the parties agree that the Eleventh Amendment immunizes the State and the GDOT from suit under the FHA and Section 1983, and bars any similar claims against Commissioner McMurray for money damages or past equitable relief. See Dkt. No. 8-1, pp. 8-11; Dkt. No. 12, p. 6 n.1. The parties also do not dispute that Commissioner McMurray is not

AO 72A
(Rev. 8/82)

immune from FHA and Section 1983 claims seeking prospective equitable relief. See Dkt. No. 8-1, p. 8 n.6; Dkt. No. 12, p. 7. On the agreement of the parties, then, Defendants' Motion to Dismiss would have been granted as to Plaintiffs' FHA and Section 1983 claims against the State and the GDOT, as well as their FHA and Section 1983 claims for damages and nonprospective equitable relief against Commissioner McMurray.

### D. Legal Sufficiency of Plaintiffs' FHA Claims (Count I)

The FHA aims "to prohibit discrimination in the sale, rental, financing, or brokerage of private housing," as well as "to provide federal enforcement procedures for remedying such discrimination." Lyons v. Kyner, 367 F. App'x 878, 883 (10th Cir. 2010) (citing Otero v. N.Y. City Hous. Auth., 484 F.2d 1122, 1133 (2d Cir. 1973)). As the FHA is intended to be "broad and inclusive," a court must afford it "a generous construction." City of Miami v. Bank of Am. Corp., 800 F.3d 1262, 1281 (11th Cir. 2015) (quoting Trafficante v. Metro. Life Ins., 409 U.S. 205, 209-12 (1972)).

Here, Plaintiffs seek prospective injunctive relief against Commissioner McMurray on the grounds that Defendants' Project will violate several provisions of the FHA: 42 U.S.C. § 3604(a) ("Section 3604(a)"), 42 U.S.C. § 3604(b) ("Section 3604(b)"), 42 U.S.C. § 3604(f) ("Section 3604(f)"), and 42 U.S.C. § 3617 ("Section 3617"). Pl.'s Am. Compl., ¶¶ 43-45.

### i.  Alleged Violations of Section 3604(a)

Section 3604(a) makes it unlawful "[t]o refuse to sell or rent . . . or otherwise make unavailable or deny, a dwelling to any person because of race, color, religion, sex, familial status, or national origin."  42 U.S.C. § 3604(a).[5]  Actions by both individuals and local governmental units may make housing "unavailable" in violation of this subsection.  See, e.g., Hallmark Developers, Inc. v. Fulton Cty., 466 F.3d 1276, 1283 (11th Cir. 2006) (citing Jackson v. Okaloosa Cty., 21 F.3d 1531, 1542 n.17 (11th Cir. 1994)).

In this case, the majority of Plaintiffs' allegations concerning the effects of the Project do not relate to the availability of housing in Estes Park Apartments and thus do not come within the purview of Section 3604(a).  Circumstances other than a denial of a dwelling to a prospective homeowner or tenant may render housing "unavailable," such as where discriminatory conduct after the owner's or tenant's acquisition of the dwelling results in actual or constructive eviction.  See Hunt v. Aimco Properties, L.P., 814 F.3d 1213, 1223 (11th Cir. 2016) (actual eviction); Greater New Orleans Fair Hous. Action Ctr. v. U.S. Dep't of Hous. & Urban Dev., 723 F. Supp. 2d 14, ̄23 (D.D.C.

---

[5]  The FHA defines "familial status" as "one or more individuals (who have not attained the age of 18 years)" living with a parent or legal guardian.  42 U.S.C. § 3602(k).

AO 72A
(Rev. 8/82)

2010) (collecting cases regarding constructive eviction). To proceed on a constructive-eviction theory, courts often require that a plaintiff allege that the discriminatory conduct caused his dwelling to be "'unfit for occupancy,' often to the point that [he] is 'compelled to leave.'" Bloch v. Frischholz, 587 F.3d 771, 777 (7th Cir. 2009); see, e.g., Greater New Orleans Fair Hous. Action Ctr., 723 F. Supp. 2d at 23 & n.13 (allegations regarding the devastating effects of hurricanes, and the defendants' allegedly discriminatory methods of distributing relief to affected homeowners, stated a plausible claim that the defendants' conduct prevented African American homeowners from being able to live in their houses and thus made housing "unavailable" to them under the FHA). By contrast, a mere decline in the value, desirability, or habitability of a dwelling is insufficient to make out a claim that housing is "unavailable" under Section 3604(a). See Greater New Orleans Fair Hous. Action Ctr., 723 F. Supp. 2d at 23 (collecting cases); Bloch, 587 F.3d at 777 ("Availability, not simply habitability, is the right that [Section] 3604(a) protects." (citing Southend Neighborhood Improvement Ass'n v. St. Clair Cty., 743 F.2d 1207, 1210 (7th Cir. 1984)); see, e.g., Cox v. City of Dallas, 430 F.3d 734, 740-43 (5th Cir. 2005) (city's actions in allowing a landfill to operate near a primarily African American residential area—while perhaps harming the

housing market, home values, and homeowners' "intangible interests" in their properties—did not make housing "unavailable" under the statute); <u>Southend Neighborhood Improvement Ass'n</u>, 743 F.2d at 1210 (county's alleged refusal to maintain the properties that it owned in primarily African American neighborhoods, even if damaging the intangible interests of neighboring property owners, did not affect the availability of housing in a manner proscribed by the FHA); <u>Laramore v. Ill. Sports Facilities Auth.</u>, 722 F. Supp. 443, 446, 452 n.5 (N.D. Ill. 1989) (government agency's construction of a baseball stadium in an almost exclusively African American area—which would subject residents to noise, intense lights, limited access to their residences, and decreased security—did not implicate the availability of housing under Section 3604(a)).

Plaintiffs do not allege that anyone will be denied the right to rent in Estes Park Apartments, or will be evicted from his unit, for discriminatory reasons. Instead, Plaintiffs aver that as a result of Defendants' construction of a roadway in close proximity to Estes Park Apartments, "[a]t least eight tenants may be displaced, including six minority tenants," and Plaintiffs Paulk and Wilcox "will be forced to vacate" their units. Pl.'s Am. Compl., ¶¶ 23(c), 26. In support of these contentions, Plaintiffs rely, in large part, on the allegations that the roadway will run within seven feet of the Estes Park

AO 72A
(Rev. 8/82)

Apartments clubhouse and thirty feet of one apartment building, and that this close proximity will create increased traffic, accessibility issues, and safety concerns. Id. at ¶¶ 19, 23. These allegations suggest, at most, that the closeness of the busy highway will be an annoyance to Estes Park Apartments residents and may negatively impact the desirability or habitability of the apartment units in the complex. These are not conditions that will make any unit wholly unfit for habitation and, as such, do not impair the availability of housing under the FHA.

While Plaintiffs' assertion regarding excessive noise levels—namely, that the noise will create a risk of losing federal subsidies and, consequently, displacing tenants—more closely relates to the availability of housing, see id. at ¶¶ 9–11, 23(d), Plaintiffs nevertheless fail to make out a Section 3604(a) claim on this basis. Plaintiffs' reference to an unspecified level of "risk" falls short of demonstrating that a loss of federal subsidies is plausible, rather than merely possible. Even if Plaintiffs were to make such a showing, Plaintiffs' pleading does not establish a sufficient causal relationship between such housing conditions and the Defendants' conduct. See Jersey Heights Neighborhood Ass'n v. Glendening, 174 F.3d 180, 192 (4th Cir. 1999) ("[T]he Fair Housing Act requires a . . . causal link between housing and the disputed

action." (citing Edwards v. Johnston Cty. Health Dep't, 885 F.2d 1215, 1222 (4th Cir. 1989))). That is, this case is distinguishable from those in which housing is allegedly "unavailable" as a direct result of discriminatory "housing-related" policies or programs. See Jersey Heights Neighborhood Ass'n v. Glendening, 174 F.3d 180, 192 (4th Cir. 1999) (listing examples of "housing-related" policies that would come within the purview of Section 3604(a), such as "racial steering by real estate agents" and "discriminatory rental policies" (first citing Vill. Of Bellwood v. Dwivedi, 895 F.2d 1521, 1521 (7th Cir. 1990); then citing Betsey v. Turtle Creek Assocs., 736 F.2d 983, 983 (4th Cir. 1984))); Southend Neighborhood Improvement Ass'n, 743 F.2d at 1209 (citing mortgage and insurance "redlining" and exclusionary zoning decisions as actions directly affecting the availability of housing); cf. Greater New Orleans Fair Hous. Action Ctr., 723 F. Supp. 2d at 23 (local government agency's allegedly discriminatory hurricane-relief program was tied to housing and gave rise to a cognizable Section 3604(a) claim). Rather, the disputed action in this case is the local government's siting of a roadway. Pl.'s Am. Compl., ¶¶ 2-3, 43. Because the roadway-planning process is not related to housing and could only remotely and indirectly impact Plaintiffs' housing rights under the FHA, it is not the type of conduct that Section 3604(a) is intended to prevent. See Jersey

AO 72A
(Rev. 8/82)

Heights Neighborhood Ass'n v. Glendening, 174 F.3d at 192–93

(state's siting of a bypass road, which would effectively close

off expansion of a predominantly African American neighborhood,

was "too remotely related to the housing interests that are

protected by the Fair Housing Act" to come within the scope of

Section 3604(a)); see also Laramore, 722 F. Supp. at 452 n.5

(local government agent's siting of a baseball stadium did not

give rise to a cause of action under Section 3604(a)).

### ii. Alleged Violations of Section 3604(b)

Section 3604(b) prohibits discrimination "in the terms,

conditions, or privileges of sale or rental of a dwelling, or in

the provision of services or facilities in connection therewith,

because of race, color, religion, sex, familial status, or

national origin."  42 U.S.C. § 3604(b).

Plaintiffs' factual allegations do not implicate Section

3604(b).  First, Defendants' allegedly discriminatory conduct

does not relate to the "sale or rental" of housing.  There is a

split of authority as to whether Section 3604(b) applies to the

provision of services only in connection with the sale or rental

of housing, or whether it extends to services beyond the point

of sale.  See Steele v. City of Port Wentworth, Georgia, No.

CV405-135, 2008 WL 717813, at *12 (S.D. Ga. Mar. 17, 2008)

(collecting cases).  However, it appears that courts in the

Eleventh Circuit that have considered this issue have applied

AO 72A
(Rev. 8/82)

the narrower construction, on the grounds that it is "more consistent with the plain language of the statute." Id.; see also Lawrence v. Courtyards at Deerwood Ass'n, 318 F. Supp. 2d 1133, 1142 (S.D. Fla. 2004); Gourlay v. Forest Lake Estates Civic Ass'n of Port Richey, 276 F. Supp. 2d 1222, 1233 (M.D. Fla. 2003), vacated on other grounds, No. 8:02CV1955T30TGW, 2003 WL 22149660 (M.D. Fla. Sept. 16, 2003). As this appears to be the better reasoned interpretation, the Court follows this approach here and finds that the statute does not encompass Defendants' alleged discrimination against those who have already acquired and are now in possession of their homes.

Second, the allegedly discriminatory conduct in this case does not involve the "provision of services" contemplated by Section 3604(b). Courts have consistently construed this language as referring to services generally provided by local governmental units, such as police or fire protection and garbage collection. See Cox, 430 F.3d at 745 n.34 (collecting cases). Significantly, in cases involving a service with a more tenuous connection to housing—such as the siting of a highway or baseball stadium or the maintenance of government-owned property—courts have found that the government's allegedly discriminatory conduct was not the type that is actionable under the FHA. See Jersey Heights Neighborhood Ass'n, 174 F.3d at 193 (highway site selection was not the provision of a "service"

AO 72A
(Rev. 8/82)

under Section 3604(b)); <u>Southend Neighborhood Improvement Ass'n</u>, 743 F.2d at 1210 (administration of county-held properties was not a "service"); <u>Laramore</u>, 722 F. Supp. at 452 (stadium site selection was not a "service"). Because Section 3604(b) does not encompass Defendants' decision making as to the location of roadways, Plaintiffs could not sustain a claim on these grounds.

### iii. Alleged Violations of Section 3604(f)

Section 3604(f) bars housing discrimination based on disability. <u>See</u> 42 U.S.C. § 3604(f). In relevant part, this provision makes it unlawful "to . . . make unavailable or deny[] a dwelling to any buyer or renter because of a handicap" or "[t]o discriminate against any person . . . in the provision of services or facilities in connection with such dwelling[] because of a handicap." <u>Id.</u> § 3604(f)(1)-(2). As the conduct proscribed by Section 3604(f) is analogous to that prohibited under Section 3604(a) and Section 3604(b), and Plaintiffs rely on the same factual allegations to support these claims, Plaintiffs' Section 3604(f) claims would fail for the reasons discussed <u>supra</u>. <u>See</u> <u>supra</u> Subparts I.D.i-ii.

### iv. Alleged Violations of Section 3617

Section 3617 provides that "[i]t shall be unlawful to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed" any right granted or protected under the

AO 72A
(Rev. 8/82)

FHA. 42 U.S.C. § 3617. Courts have interpreted "interfere" as extending "only to discriminatory conduct that is so severe or pervasive that it will have the effect of causing a protected person to abandon the exercise of his or her housing rights." Lawrence, 318 F. Supp. 2d at 1144 & n.6 (quoting Gourlay, 276 F. Supp. 2d at 1235) (collecting cases limiting Section 3617 to only the most extreme and egregious conduct). In the absence of a violation of Section 3064(a), Section 3604(b), or related provision, conduct rises to the level of an actionable "interference" only if it is so severe or pervasive that it could be considered as threatening or violent. Id. at 1144 (citing Gourlay, 276 F. Supp. 2d at 1236).

Plaintiffs concede that they do not state any claim based on coercion, intimidation, or threats. See Dkt. No. 12, pp. 15–16. While Plaintiffs maintain that Defendants' Project will interfere with their housing rights, see Pl.'s am. compl., ¶ 45; dkt. no. 12, pp. 15–16, Plaintiffs do not complain of any conduct on the part of Defendants that is sufficiently egregious as to state an interference claim. Plaintiffs allege only that Defendants' construction of a roadway adjacent to certain common areas and one apartment building in Estes Park Apartments will result in increased traffic, accessibility problems, safety concerns, and noise. Pl.'s Am. Compl., ¶¶ 19, 23. Because Defendants' actions could not reasonably be viewed as severe or

AO 72A
(Rev. 8/82)

pervasive, much less threatening or violent, Plaintiffs could not have sustained a claim under Section 3617.

### E. Legal Sufficiency of Plaintiffs' Title VI Claims (Count II)

Title VI prohibits discrimination on the basis of race, color, or national origin in any program or activity that receives federal financial assistance. Mack v. City of High Springs, 486 F. App'x 3, 7 (11th Cir. 2012) (citing Robinson v. Vollert, 602 F.2d 87, 89 (5th Cir.1979)). "Title VI itself provides no more protection than the equal protection clause—both provisions bar only intentional discrimination." Elston v. Talladega Cty. Bd. of Educ., 997 F.2d 1394, 1406 n.11 (11th Cir. 1993) (citing Alexander v. Choate, 469 U.S. 287, 293 (1985)). As such, where a plaintiff alleges violations of both Title VI and the Fourteenth Amendment Equal Protection Clause, the court need not engage in a separate discussion of the Title VI claims, because "such an inquiry would duplicate exactly [the] equal protection analysis." Id.

Plaintiffs do not state any colorable Title VI claim in this case, as demonstrated by the equal protection analysis set forth below. See infra Subpart I.F.ii. Defendants' Motion to Dismiss these claims would be granted.

AO 72A
(Rev. 8/82)

**F. Legal Sufficiency of Plaintiffs' Section 1983 Claims (Count III)**

Section 1983 provides relief where a state official has violated the plaintiff's federal constitutional or statutory rights. 42 U.S.C. § 1983. Here, Plaintiffs' Section 1983 claim against Commissioner McMurray is based on alleged violations of their Fourteenth Amendment substantive due process and equal protection rights. Pl.'s Am. Compl., ¶ 53; Dkt. No. 12, pp. 17–20.[6]

i. <u>Alleged Violations of Fourteenth Amendment Due Process Rights</u>

The Due Process Clause provides that a state must not "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV. "The substantive component of the Due Process Clause protects those rights that are 'fundamental,' that is, rights that are 'implicit in the concept of ordered liberty.'" <u>McKinney v. Pate</u>, 20 F.3d 1550, 1556 (11th Cir. 1994) (quoting <u>Palko v. Connecticut</u>, 302 U.S. 319, 325 (1937)). Fundamental rights are most, but not all, of the rights enumerated in the Bill of Rights, as well as certain

---

[6] Plaintiffs' Amended Complaint also cites the Fourth Amendment as a basis for their Section 1983 claims. Pl.'s Am. Compl., ¶ 53. However, because Plaintiffs do not address any Fourth Amendment claim in response to Defendants' Motion to Dismiss the same, it appears that Plaintiffs do not intend to proceed under the Fourth Amendment. Even if Plaintiffs did intend to do so, Plaintiffs do not set forth any factual allegations bearing on the protections granted under the Fourth Amendment. <u>See</u> U.S. Const. amend. IV (right to be free from unreasonable searches and seizures).

AO 72A
(Rev. 8/82)

unenumerated rights created by the U.S. Constitution. <u>Id.</u>
(citing <u>Planned Parenthood v. Casey</u>, 505 U.S. 833 (1992)).
Property interests, such as those at issue in this case, are not
established by the Constitution, but rather are created "by
existing rules or understandings that stem from an independent
source such as state law." <u>Kentner v. City of Sanibel</u>, 750 F.3d
1274, 1279 (11th Cir. 2014) (citing <u>Bd. of Regents of St. Coils.</u>
<u>v. Roth</u>, 408 U.S. 564, 577 (1972)). "As a result, there is
generally no substantive due process protection for state-
created property rights." <u>Id.</u> However, one exception to this
general rule exists "where a person's state-created rights are
infringed by a 'legislative act.'" <u>Id.</u> at 1279-80 (citing <u>Lewis</u>
<u>v. Brown</u>, 409 F.3d 1271, 1273 (11th Cir. 2005)). In that
situation, the substantive component of the Due Process Clause
applies to protect the property owner from "arbitrary and
irrational governmental action." <u>Id.</u> (citing <u>Lewis</u>, 409 F.3d at
1273).

In the case at bar, Plaintiffs' property rights exist
pursuant to Georgia state law. <u>See, e.g.</u>, <u>Rabun Cty. v.</u>
<u>Mountain Creek Estates, LLC</u>, 632 S.E.2d 140, 143 (Ga. 2006)
(discussing the scope of property rights). The challenged
action—namely, the siting of a roadway—is a decision applicable
to the county residents at large and, therefore, is legislative
in nature. <u>See Kentner</u>, 750 F.3d at 1280 (legislative acts

apply to a large segment, if not all, of society and include "prospective 'zoning-type decisions'" (first citing McKinney, 20 F.3d at 1557 n.9; then quoting 75 Acres, LLC v. Miami-Dade Cty., 338 F.3d 1288, 1296 n.12 (11th Cir. 2003))). As such, Plaintiffs allege an exception to the general rule prohibiting due process claims premised on state-created interests, and the Court must proceed beyond the "fundamental rights" inquiry.

"Substantive due process challenges that do not implicate fundamental rights are reviewed under the 'rational basis' standard." Kentner, 750 F.3d at 1280 (citing Fresenius Med. Care Holdings, Inc. v. Tucker, 704 F.3d 935, 945 (11th Cir. 2013)). To survive rational-basis scrutiny, "the challenged provision need only be rationally related to a legitimate government purpose." Foley v. Orange Cty., No. 14-10936, 2016 WL 361399, at *2 (11th Cir. Jan. 29, 2016) (quoting Schwarz v. Kogan, 132 F.3d 1387, 1390-91 (11th Cir. 1998)). A governmental entity is "not required to convince the courts of the correctness of their legislative judgments"; rather, the party challenging the entity's legislative judgment bears the burden of proving that "the legislative facts on which the classification is apparently based could not reasonably be conceived to be true by the governmental decision[]maker." Kentner, 750 F.3d at 1281 (quoting Minnesota v. Clover Leaf Creamery Co., 449 U.S. 456, 464 (1981)). As the Eleventh

AO 72A
(Rev. 8/82)

Circuit has recognized, the rational-basis standard is "highly deferential," such that legislative acts reviewed under this standard are found to be unconstitutional "in only the most exceptional of circumstances." Id. (citing Williams v. Pryor, 240 F.3d 944, 948 (11th Cir. 2001)).

Even accepting Plaintiffs' factual allegations in this case as true, Plaintiffs do not plausibly allege that Defendants' siting of the roadway lacks a rational basis. Plaintiffs' Amended Complaint puts forth mere legal conclusions regarding the allegedly arbitrary and capricious nature of Defendants' decision, without offering any factual matter in support. To the contrary, Plaintiffs' pleading suggests that Defendants did, in fact, do the following: (1) hold an Initial Team Concept Meeting, at which the City Manager discussed the impact on Estes Park Apartments residents with GDOT representatives; (2) conduct an EJ to consider the effects of the Project on residents in the area; (3) submit a NEPA report to the FHWA; and (4) meet with Estes Park representatives to discuss the matter. Pl.'s Am. Compl., ¶¶ 32-33, 37, 39.

Plaintiffs contend that Defendants used "misleading data" in their reports by relying on an outdated census, but their allegations do not suggest that the data was obviously untrue and, in any event, demonstrate that Defendants considered the effect on Estes Park Apartments residents during other stages of

AO 72A
(Rev. 8/82)

the decision-making process.  Id. at ¶¶ 32–33, 35, 37, 38–39.

Plaintiffs also complain that Defendants never contacted the

Estes Park Apartments owner or any tenants to discuss the

Project's impact, and refused to consider the alternative plan

submitted by Estes Park in December 2015, see id. at ¶¶ 36, 39,

yet nothing in Plaintiffs' Amended Complaint suggests that

Defendants had an obligation to do so.  While perhaps

undermining the accuracy of some pieces of Defendants'

evaluation, these allegations far from demonstrate that

Defendants' ultimate decision regarding the siting of the

roadway was wholly arbitrary and without a basis in fact.  Thus,

Plaintiffs' due process claims would be subject to dismissal,

and this portion of Defendants' Motion would be granted.

   ii. Alleged Violations of Fourteenth Amendment Equal
     Protection Rights

  Under the Equal Protection Clause, it is unlawful for a

state to "deny to any person within its jurisdiction the equal

protection of the laws." U.S. Const. amend. XIV.  "Equal-

protection claims generally concern governmental classification

and treatment that impacts an identifiable group of people

differently than another group of people."  Foley, 2016 WL

361399, at *3 (citing Corey Airport Servs., Inc. v. Clear

Channel Outdoor, Inc., 682 F.3d 1293, 1296 (11th Cir. 2012)).

Accordingly, to allege an equal protection violation, a

plaintiff must show that the state has "treated him differently from a similarly situated person based on a constitutionally protected interest." Holloman v. Jacksonville Hous. Auth., No. 06-10108, 2007 WL 245555, at *3 (11th Cir. Jan. 30, 2007) (citing Jones v. Ray, 279 F.3d 944, 946-47 (11th Cir. 2001)). The different treatment must be the result of intentional discrimination. See Arlington Heights v. Metro. Hous. Dev. Corp., 429 U.S. 252, 265 (1977). Factors bearing on intentionality include the following: "substantial disparate impact, a history of discriminatory official actions, procedural and substantive departures from the norms generally followed by the decision-maker, and discriminatory statements in the legislative or administrative history of the decision." Elston v. Talladega Cty. Bd. of Educ., 997 F.2d 1394, 1406 (11th Cir. 1993) (citing Arlington Heights, 429 U.S. at 265-69). Notably, discriminatory intent may be present "even where the record contains no direct evidence of bad faith, ill will or any evil motive on the part of public officials." Id. (quoting Williams v. City of Dothan, 745 F.2d 1406, 1414 (11th Cir. 1984)).

Here, the Amended Complaint falls far short of stating any viable equal protection claim. The closest that Plaintiffs come to identifying a comparator is their claim that there is no adverse impact on the "five non-minority owned business properties" on the opposite side of the bypass, where "there is

AO 72A
(Rev. 8/82)

no residential development." Pl.'s Am. Compl., ¶ 27. By

Plaintiffs' own admission, then, these properties are different

from their own in that they are not located on the same side of

the road and are used for an entirely different purpose.

Particularly in the context of road development, these

distinctions are not without significance.

Plaintiffs also fail to allege facts sufficiently

demonstrating intentional discrimination. The alleged disparate

impact cannot fairly be deemed "substantial," see Elston, 997

F.2d at 1406 (citing Arlington Heights, 429 U.S. at 265-69), as

Plaintiffs contend only that six minority tenants might be

displaced, Pl.'s am. compl., ¶ 23. Plaintiffs do not allege

that Defendants have a history of discriminatory actions, nor do

they assert that they made any discriminatory statements in

planning the Project. Moreover, there is no allegation that

Defendants departed from the procedural norms in planning or

executing the Project; to the contrary, Plaintiffs acknowledge

that Defendants held a meeting, conducted the requisite

analyses, and submitted the necessary documentation to

government agencies. See Pl.'s Am. Compl., ¶¶ 32, 35, 37.

While Plaintiffs maintain that Defendants disregarded the

requirements of the EJ in relying on outdated census data, see

id. at ¶ 35, this allegation suggests only a substantive

departure from the norms of completing an EJ. Absent any

indication that Defendants departed from their own substantive decision-making norms, Plaintiffs fail to plausibly allege any intentionality on their part. See Elston, 997 F.2d at 1406 (considering "substantive departures from the norms generally followed by the decision-maker" as indicative of intentional discrimination) (citing Arlington Heights, 429 U.S. at 265-69)).

As Plaintiffs fail to set forth facts supporting both the comparator and intentionality elements of an equal protection claim, Plaintiffs' Section 1983 claim on this basis would be dismissed. Defendants' Motion as to this claim would, therefore, be granted.

### G. Legal Sufficiency of Plaintiffs' "CDBG Requirements" Claims (Count IV)

"[T]here is no express or implied statutory private right of action for HUD violations." Bates v. JPMorgan Chase Bank, NA, 768 F.3d 1126, 1130-31 (11th Cir. 2014) (citing Roberts v. Cameron-Brown Co., 556 F.2d 356, 360 (5th Cir. 1977) ("[T]he National Housing Act and the regulations promulgated thereunder deal only with the relations between the mortgagee and the government, and give the mortgagor no claim to duty owed nor remedy for failure to follow."); Cornelius v. Bank of Am., N.A., No. 1:12-cv-0585-JEC, 2012 WL 4468746, at *6 (N.D. Ga. Sept. 27, 2012); and Krell v. Nat'l Mortg. Corp., 448 S.E.2d 248, 249 (Ga. Ct. App. 1994) (violation of HUD regulations did not give rise

AO 72A
(Rev. 8/82)

to a private cause of action)).  Plaintiffs maintain that Defendants violated the HUD Guidebook's requirements for those receiving financial assistance through CDBG.  Pl.'s Am. Compl., ¶¶ 56-60.  Even accepting this allegation as true, Plaintiffs have no private right of action to enforce the HUD policy. Accordingly, Defendants' Motion would be granted as to these claims.

### H. Legal Sufficiency of Plaintiffs' Claims for Declaratory Relief (Count V)

"[U]pon the filing of an appropriate pleading," a court "may declare the rights and other legal relations of any interested party seeking such declaration."  28 U.S.C. § 2201(a).  Based on the above analysis, Plaintiffs fail to state any claim that would entitle them to declaratory relief.  Thus, to the extent that this claim would not already be barred by the Eleventh Amendment, see supra Subpart I.C, it would be due to be dismissed.  This portion of Defendants' Motion would be granted.

## II. Defendants' Motion to Stay Discovery (Dkt. No. 9) and Plaintiffs' Motion for Preliminary Injunction (Dkt. No. 14)

As the Court has determined that this action is subject to dismissal on abstention grounds, all other pending Motions are now moot.  To the extent that the Court entered an Order (dkt. no. 18) and Supplemental Order (dkt. no. 19) concerning Plaintiffs' Motion for Preliminary Injunction, those Orders are **WITHDRAWN.**

**CONCLUSION**

In light of the foregoing, Defendants' Motion to Dismiss (dkt. no. 8) is hereby **GRANTED**. As such, Defendants' Motion to Stay Discovery (dkt. no. 9) and Plaintiffs' Motion for Preliminary Injunction (dkt. no. 14) are moot. The Court's Order (dkt. no. 18) and Supplemental Order (dkt. no. 19) regarding Plaintiffs' Motion are **WITHDRAWN**. The Clerk of Court is **DIRECTED** to close this case.

 **SO ORDERED,** this 24TH day of May, 2016.

_____
LISA GODBEY WOOD, CHIEF JUDGE
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA